I! ARMSTRONG, Judge.
This is a suit brought under the Private Works Act, La. R.S. 9:4801 et seq, and other legal theories by an unpaid supplier of materials that were ultimately used in a construction project. The defendant prime contractor on the construction project, and its co-defendant surety, moved for summary judgment on the ground that the plaintiff was a supplier to a supplier, rather than a supplier to a contractor or subcontractor, and thus had no rights under the Private Works Act and on the ground that no other legal theory was applicable so as to allow the plaintiff recovery under the facts of this case. The trial court agreed with the defendants and granted the summary judgment. The plaintiff appeals. The judgment of the trial court is correct. In light of the facts which are uncontested or as to which there is no genuine issue, the plaintiff has no rights under the Private Works Act and the other legal theories urged by the plaintiff are without merit. Therefore, we affirm.
W.S. Bellows Construction Company contracted to act as general contractor to build out (i.e. complete the interior for tenant occupancy) a number of floors hof the CNG Tower building in New Orleans. The space was to be occupied by McDermott and the project was variously described by the parties as the “CNG Tower job” and the “McDermott job.”
Bellows subcontracted with the Sandoz Group, Inc. for installation of cabling for the computer system. Under that subcontract, Sandoz was to supply all the necessary cabling material.
Sandoz purchased the necessary cabling materials for the job from Omnimark, Inc. In turn, Omnimark had purchased the cabling materials from plaintiff Cable & Connector Warehouse, Inc. Sandoz and Omnimark were owned by the same person, Louis Sandoz, but were separate corporations.
Before beginning its on-site work, Sandoz invoiced Bellows for $112,066.23. The invoice states that $100,066.23 is for “pre-pur-chased materials” and $12,000 is for “professional fees for project design work-to-date.” It is undisputed that the $100,066.23 was for all of the materials for the Sandoz subcontract with Bellows and that these were the materials which Sandoz purchased from Om-nimark and which Omnimark purchased from Cable & Connector. Bellows first inspected the cabling materials, which were located at Cable & Connector’s facility in Baton Rouge, and then paid the Sandoz invoice. However, while Sandoz was paid in full for the cabling materials by Bellows, Sandoz did not pay Omnimark and Omnimark did not pay Cable & Connector.
Cable & Connector shipped the cabling materials to the CNG Tower job site in several shipments over the course of several weeks. At or about the time of each shipment, Cable & Connector rendered an invoice for the materials shipped. Other than invoices which were solely for freight charges, there were nine Cable & Connector invoices. Each one of those nine invoices states that the materials |3are “sold to” “Om-nimark, Inc./CNG Towers.” Some of the invoices state “ship to” “The Sandoz Group/Omnimark,” one states “ship to” Bellows and several state “ship to” “will call Bill Knock.”
At some point in the project, Bellows terminated Sandoz as subcontractor because Sandoz’ license was not in order. Bellows had Hi-Tech Electric, Inc., which was an electrical subcontractor already working on the CNG Tower project, complete the work that had been subcontracted to Sandoz. However, Sandoz continued in some sort of advisory capacity to assist Hi-Tech and Bellows to finish the job.
Cable & Connector was never paid for the cabling materials and recorded a Private Works Act lien against the CNG Tower Building. Bellows obtained a surety bond from Federal Insurance Company which was deposited with the Recorder of Mortgages so as to cancel Cable & Connector’s lien. Cable & Connector sued Omnimark, Sandoz, Bellows, and Federal. The summary judgment appealed from dismissed Cable & Connector’s suit only as against Bellows and Federal.
Because this case comes before us on an appeal from a summary judgment, we must determine whether there was any genuine issue of material fact and whether the mover *1275 was entitled to judgment as a matter of law. See La.Code Civ. Proe. art. 966(B); see also 1997 La. Acts 483 (amending Article 966); Hayes v. Autin, No. 96-287 (La.App. 3rd Cir. 12/26/96), 685 So.2d 691, 694-95 (cited in Act 483), writ denied, No. 97-C-0281 (La.3/14/97), 690 So.2d 41.
A key legal point which impacts the issues and arguments in this case is that, while a supplier to a subcontractor or a contractor has certain rights under the Private Works Act, a supplier to a supplier does not have such rights under that [4statute. Put another way, in order to have rights under the Private Works Act, a supplier must sell directly to a subcontractor or a contractor. This arises from the statute’s language granting rights to “Sellers, for the price of movables sold to a contractor or a subcontractor.” La. R.S. 9:4802(A)(3). See generally Leonard B. Hebert, Jr. & Co. v. Kinler, 336 So.2d 922, 924 (La.App. 4th Cir.1976) in which the court stated: “Under the settled law of this State, a materialman who furnishes material to a materialman has no right to a lien.” Because .Cable & Connector sold cabling to another supplier (Omnimark), rather than to a subcontractor (Sandoz) or to a contractor (Bellows), Cable & Connector has no rights under the Private Works Act. Cable & Connector recognizes this legal rule but in an attempt to avoid its application advances a number of arguments, each of which will be discussed below.
Another legal rule that is of importance to some of the issues in this case is that, in a sale transaction, ownership of the things sold is transferred even if there has not yet been payment or delivery. A sale is perfected as soon as there is agreement between the buyer and seller as to the thing sold and the price. La. Civ.Code art. 2439. “Ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid.” La. Civ.Code art. 2456. In the present case, the purchase of the cabling materials from Cable & Connector was made by Omnimark using a purchase order on an Omnimark letterhead. Thus, the sale of the cabling materials by Cable & Connector to Omnimark, and the transfer of ownership of the cabling materials from Cable & Connector to Omnimark, was accomplished before the materials were shipped by Cable & Connector and before Cable & Connector rendered invoices for the cabling materials. This is of some | gimportance because some of Cable & Connector’s arguments are either explicitly or implicitly premised on the notion that the cabling materials were not sold until they were shipped and invoices were rendered by Cable & Connector.
Cable & Connector’s first argument is that Bellows and Hi-Tech (the subcontractor who completed the cabling work after Sandoz was terminated) actually purchased most of the cabling material and, because that would constitute a sale to a contractor or subcontractor, Cable & Connector has rights under the Private Works Act as well as a contract claim against Bellows (Hi-Tech is not a party to this case). However, Cable & Connector’s only factual basis for this argument is that part of the cabling material was delivered to the CNG Tower job site after Sandoz had been terminated as subcontractor by Bellows. Because of the termination of Sandoz, Cable & Connector assumes that the cabling materials delivered after that termination must have been “ordered” by Bellows and/or Hi-Tech.[1] However, with respect to the question of who purchased the cabling material from Cable & Connector, it does not matter who “ordered” the delivery of the cabling material to the CNG Tower job site. Well prior to the termination of Sandoz’ subcontract, the cabling material had been sold by Cable & Connector to Omnimark. Thus, when Cable & Connector delivered cabling material to the CNG Tower job site after Sandoz’ termination, Cable & Connector did not own the cabling material and so could not be selling it to Bellows or Hi-Tech. Instead, at that time, the cabling material was owned by Omnimark or, if Omnimark had already re-sold it to Sandoz, it was owned by Sandoz.
*1276 IsAs its next argument on appeal, Cable & Connector very briefly asserts that Bellows, “by ordering and authorizing the ordering and use of the Cable & Connector materials, engaged in acts that reasonably induced Cable & Connector to believe it would be paid for the materials.” Thus, argues Cable & Connector, Bellows is liable for Cable & Connector’s “detrimental rebanee” upon Bellows. However, neither the excerpts of the depositions of Bellows’ employees nor the other discovery materials filed by Cable & Connector in opposition to the motion for summary judgment show any such orders or authorization by Bellows. Also, the affidavit filed by Cable & Connector in opposition to the motion for summary judgment does not mention any reliance on Bellows or any facts from which such reliance might be inferred. Indeed, the record is devoid of any evidence that Cable & Connector was looking to or communicating with Bellows when it delivered the cabbng materials. The mere fact that Bellows was the general contractor on the CNG Tower project, and that the cabbng material was delivered to and used in the CNG Tower project, does not constitute an assurance by Bellows that Cable & Connector would be paid.
Cable & Connector’s next argument on appeal is that Bellows is estopped from denying responsibihty for the cabbng because “Louisiana, under the doctrine of quantum meruit, recognizes that a person, such as Bellows Construction, may not escape the responsibihty of paying for materials it uses by avoiding contractual formalities.” In support óf its argument, Cable & Connector quotes the following passage from Royal Construction Co. v. Sias, 496 So.2d 1301 (La.App. 3rd Cir.1986): “Quantum meruit is an equitable doctrine which is based on the concept that no one who benefits by the labor and materials of another, should be unjustly enriched thereby.” But, in the present ease, there was no “unjust enrichment” of ^Bellows. It is undisputed that Bellows paid Sandoz $100,066.23 for the cabling materials and there is no reason to doubt that $100,-066.23 was a normal course of business price paid in an arms-length transaction. Furthermore, the issue is not merely one of an absence of contractual formalities. Indeed, Bellows contracted formaby with Sandoz and Cable & Connector contracted formally with Omnimark. In contrast, there was no contract at all between Bellows and Cable & Connector.
Cable & Connector’s next argument on appeal is that it actually sold the cabbng materials not to Omnimark but, instead, to Sandoz. If that were true, then Cable & Connector could have rights under the Private Works Act, as Sandoz was a subcontractor rather than a supplier.
As discussed above, the undisputed deposition testimony of Louis Sandoz was that the cabbng materials were purchased from Cable & Connector by Omnimark using a purchase order on Omnimark stationary. Cable & Connector did not file any affidavits denying that deposition testimony of Louis Sandoz or file any discovery materials that were inconsistent with Louis Sandoz’ deposition testimony.
Instead, in support of its argument that it actually sold the cabbng materials to Sandoz, Cable & Connector asserts that: “Omnimark was simply a name under which the Sandoz Group was acting.” But, the undisputed testimony of Louis Sandoz was that Omnimark and Sandoz were two separate corporations, each having been separately incorporated under Louisiana law. This point was not disputed by any Cable & Connector affidavits despite the fact that the corporate status of Omnimark and Sandoz could easily be checked with the Secretary of State’s office. Indeed, Cable & Connector sued Omnimark and Sandoz, each as a separate corporation, in its petition initiating this action.
[ ¡¡Cable & Connector filed an affidavit which states: “That until long after delivery of the materials Cable & Connector Warehouse bebeved that Omnimark was a division of the Sandoz Group.” The fact that Cable & Connector might have bebeved that Omni-mark and Sandoz were affiliated (which they were in the sense that each was owned by Louis Sandoz) is of no moment. The mere fact that two corporations are affiliated in some way (e.g.parent-subsidiary) does not mean that a contract with one of those corporations is a contract with the other.
*1277 Further, the Cable & Connector affidavit does not state that Cable & Connector believed (much less state facts giving Cable & Connector reason to believe) that “Omni-mark” was a trade name used by Sandoz. Indeed, the Cable & Connector invoices all state that the cabling materials were sold to “Omnimark, Inc.” which shows that Cable & Connector knew that Omnimark, to which they were selling, was its own corporation.
Lastly as to this argument, even if Cable & Connector had reasonable grounds to have believed that Omnimark was a trade name used by Sandoz, and that Sandoz might be hable for Omnimark’s debt to Cable & Connector (a point we do not decide), that would not equate to Cable & Connector having actually supplied a subcontractor (Sandoz) rather than a supplier (Omnimark) so that Cable & Connector would have rights under the Private Works Act.
Next, Cable & Connector argues that Om-nimark’s role in the transaction should be ignored for purposes of determining whether Cable & Connector has rights under the Private Works Act. In other words, Cable & Connector argues that it should be treated as if it sold the cabling materials directly to Sandoz rather than to Omnimark. Of course, as Sandoz was a subcontractor, rather than ajgsupplier, such treatment would result in Cable & Connector having rights under the Private Works Act.
Cable & Connector asserts that Omni-mark’s role in the transaction should be ignored because Omnimark and Sandoz were not sufficiently separate — i.e. that we should disregard the separate corporate legal status of Omnimark and Sandoz for purposes of the Private Works Act. We believe this argument is unsound both factually and legally.
Factually, Omnimark and Sandoz were owned by the same person, Louis Sandoz, and Omnimark borrowed employees and office facilities from Sandoz (typically, with compensation to Sandoz although there is a dispute as to whether compensation was paid in the present case). However, Omnimark and Sandoz had separate bank accounts for their funds and kept separate accounting records. Also, the two corporations had different lines of business in that Sandoz provided services whereas Omnimark was a materials sourcing company. Sandoz bought materials from suppliers other than Omnimark and Omnimark sold materials to customers other than Sandoz. It is apparent that the two corporations .functioned as distinct business entities.
Legally, Cable & Connector cites no legal authority for the proposition that the separate legal status of two corporations should be disregarded so that a supplier of a supplier will be given the Private Works Act rights of a supplier to a subcontractor. Further, the Private Works Act may not be applied expansively as Cable & Connector urges. To the contrary, hen statutes, because they are in derogation of common rights, must be strictly construed. See e.g., Fruge v. Muffoletto, 242 La. 569, 583, 137 So.2d 336, 341 (1962); and Hebert v. Kinler, 336 So.2d 922, 924 (La.App. 4th Cir.1976). Cable & Connector’s claim does lipnot fit within the Private Works Act, and we may not stretch the statute to make it fit.
Lastly, Cable & Connector argues that Omnimark was merely an agent for Sandoz as to the purchase of the cabling material and that, thus, the cabling material was really sold to Sandoz. But, there is not a shred of evidence in the deposition excerpts, exhibits and the affidavit filed below that Omni-mark was acting as an agent for Sandoz as to the purchase of the cabling material. To the contrary, the evidence is that Omnimark made its own purchase of the cabling material and then resold it to Sandoz. This is as Cable & Connector itself understood the transaction at the time as its invoices all state that the cabling material was sold to Omnimark.
For the foregoing reasons, the judgment of the trial court is affirmed.

AFFIRMED.

PLOTKIN, J., concurs with written reasons.

. Actually, in view of the fact that Sandoz remained on the CNG Towers job, after termination as subcontractor, in some sort of advisory role to Hi-Tech, it seems equally plausible that Sandoz "ordered” the cabling material even after it was terminated as subcontractor.